**HOLLYWOOD COMMUNITY SYNAGOGUE, INC.**
Plaintiff,

v.

**CITY OF HOLLYWOOD, Florida and Sal Oliveri, individually,**
Defendants.

**United States of America, Plaintiff,**

v.

**City of Hollywood, Defendant.**

No. 04–61212–CIV, 05–60687CIV.

United States District Court,
S.D. Florida.

May 10, 2006.

Franklin L. Zemel, Esq., Jason Gordon, Esq., Arnstein & Lehr LLP, Ft. Lauderdale, FL, Counsel for Plaintiff Hollywood Community Synagogue, Inc.

Daniel L. Abbott, Esq., Robert Oldershaw, Esq., Assistant City Attorney, Thomas J. McCausland, Esq., Chad B. Hess, Esq., Conroy Simberg, et al., Hollywood, FL, Counsel for Defendant City of Hollywood.

W. Todd Boyd, Esq., Carlos E. Mustelier, Jr., Esq., Boyd Mustelier Smith & Parker, P.L., Miami, FL, Counsel for Defendant Sal Oliveri.

Marilynn Lindsey, Esq., Assistant U.S. Attorney, Ft. Lauderdale, FL, Sean Keveney, Esq., R. Tamar Hagler, Esq., Housing & Civil Enforcement Section—Civil Rights Division, U.S. Department of Justice, Washington, DC, Counsel for Plaintiff United States.

**OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF HOLLYWOOD'S MOTION TO DISMISS SECOND AMENDED COMPLAINT (D.E. 140) AND DENYING DEFENDANT CITY OF HOLLYWOOD'S MOTION TO DISMISS (D.E. 225)**

LENARD, District Judge.

**THIS CAUSE** is before the Court on Defendant City of Hollywood's Motion to Dismiss and/or Strike Second Amended Complaint ("Motion to Dismiss Second Amended Complaint," D.E. 140), filed January 5, 2006, and Motion to Dismiss ("Motion to Dismiss Plaintiff United States' Complaint," D.E. 225), filed May 28, 2005. On January 20, 2006, Plaintiff Hollywood Community Synagogue filed a Response to the Motion to Dismiss Second Amended Complaint. ("Hollywood Synagogue's Response," D.E. 144.) On January 30, 2006, Defendant City of Hollywood filed a Reply. ("Reply to Hollywood Synagogue's Response," D.E. 145.) On June 3, 2005, Plaintiff United States filed a Response to Defendant's Motion to Dismiss its Complaint. ("United States' Response," D.E. 226.) On June 15, 2005, Defendant City of Hollywood filed a Reply. ("Reply to United States' Response," D.E. 227.)

**I. Factual and Procedural Background**

On September 15, 2004, Plaintiff Hollywood Community Synagogue (hereinafter "HCS") filed a Complaint against Defendants City of Hollywood and Sal Oliveri (Case No. 04–61212–CIV–LENARD, D.E. 14), alleging violations of numerous rights and statutes, including the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc et seq. (hereinafter "RLUIPA."). On April 26, 2005, Plaintiff United States of America filed a Complaint against Defendant City of Hol-

lywood (Case No. 05–60687–CIV–LE-NARD, D.E. 1), requesting declaratory and injunctive relief based upon Defendant's alleged violation of RLUIPA. On June 16, 2005, the Court issued an Order consolidating these cases and administratively closing the higher numbered case (Case No. 04–61212–CIV–LENARD, D.E. 75; Case No. 05–60687–CIV–LENARD, D.E. 14), finding they involved common questions of law and fact, including substantially the same factual scenario, same defendants, and same attorneys.

On December 2, 2005, Plaintiff HCS was granted leave to file a Second Amended Complaint. (D.E. 124.) This Second Amended Complaint (D.E. 125) contains 19 counts and is the operative Complaint for purposes of City of Hollywood's Motion to Dismiss Second Amended Complaint. The legal claims and facts which follow are taken from the Second Amended Complaint in the consolidated case, unless otherwise specified. Plaintiff HCS is a Synagogue, with its principal place of business at 2215–2221 N. 46th Avenue, Hollywood, Florida 33021. (D.E. 125 at ¶ 6.) Defendant City of Hollywood is a city municipality empowered by the State of Florida to regulate the use of land and structures within the City's borders, consistent with law. (Id. at ¶ 7.) Defendant Sal Oliveri is a City Commissioner for the City of Hollywood, representing the area of Hollywood Hills. (Id. at ¶ 8.)

In 1999, Yosef Elul, then-President of the Synagogue, purchased two residences, located at 2215 and 2221 N. 46th Avenue, Hollywood. (Id. at ¶ 15.) In the neighborhood of single family residences in which the land was purchased, a place of worship could only operate if granted a Special Exception. (Id. at ¶ 19.) After the purchase of the land by Yosef Elul, the Director of Planning for the City of Hollywood advised the Synagogue that it needed to apply for a House of Worship Special Exception but assured Synagogue representatives that such Special Exception would be granted. (Id. at ¶¶ 19–20.)

In May of 2001, Alan Razla, on behalf of Mr. Elul, applied for a House of Worship Special Exception. (Id. at ¶ 21.) The Board of Appeal and Adjustments (hereinafter "BAA") granted a six month Special Exception. (Id.) Four months later, in September of 2001, Commissioner Oliveri filed an appeal to the City Commission of the BAA's grant of the Special Exception.[1] (Id. at 22.) The Commission heard the appeal and subsequently granted the Synagogue a one year Special Exception, which included certain conditions as to limited parking and persons. (Id.) Plaintiff United States notes that, upon information and belief, Defendant had never previously imposed a time limit on a special exception for a religious use, and had only once imposed a time limit on a special exception for a nonreligious use. (Case No. 05–60687–CIV–LENARD, D.E. 1 at ¶ 20.)

In late 2001 and 2002, according to Plaintiff HCS's Second Amended Complaint, Defendant Oliveri began regularly contacting the City's code enforcement and/or police departments, in order to enlist their services to issue citations and harass the Synagogue and its members. (D.E. 125 at ¶ 24.) Oliveri allegedly told code enforcement and police officers that "careful and vigilant monitoring" of the Synagogue's properties was required, instructed them to check the Synagogue's property daily for code violations, and told them to only give tickets to cars parked on the Synagogue's property. (Id. at ¶¶ 25–27.) The Synagogue's Administrator,

---

1. Plaintiff HCS does not seek liability in this action against Oliveri for his appeal to the Commission from the decision of the BAA. (Id. at ¶ 22.)

George Albo, witnessed the Code Enforcement and/or Hollywood Police Officers ticketing only those cars parked on the Synagogue's side of the street. (*Id.* at ¶ 75.). When Albo inquired as to why only the cars belonging to the Synagogue were being ticketed, the officer stated that he was following directions which came from Oliveri. (*Id.*) Also, a Code Enforcement Officer told Albo that the department was under orders from Commissioner Sal Oliveri and the Mayor to keep an eye on the Chabad [the Synagogue] and to enforce the code. (*Id.* at ¶ 76.) The Code Enforcement Officer further stated that she "paid special attention" to the Synagogue. (*Id.*) In addition, City Commissioner Cathy Anderson allegedly became aware of Defendant Oliveri's use of city personnel to constantly check on the Synagogue and publicly scolded Commissioner Oliveri, stating, "what we have here is selective enforcement and I'm very troubled by it." (*Id.* at ¶ 77.)

In September of 2002, the Development Review Board (hereinafter "DRB," formerly known as the BAA) granted Arthur Eckstein, on behalf of the Synagogue, a six month Temporary Special Exception subject to certain enumerated conditions. (*Id.* at ¶ 30.) At the September 2002 hearing, the DRB found that, subject to the enumerated conditions, the use of the property as a House of Worship was compatible with the existing natural environment and other properties within the vicinity.[2] (*Id.* at ¶ 31(A).) After the DRB hearing, Defendant Sal Oliveri filed an appeal to the Commission.[3] (*Id.* at ¶ 32.) In October 2002, the Commission denied Oliveri's appeal and allowed HCS the six month Temporary Special Exception. (*Id.* at ¶ 33.)

In March of 2003, the DRB granted the Synagogue a Permanent Special Exception subject to certain enumerated conditions being met within 180 days. (*Id.* at ¶ 33.) Defendant Sal Oliveri filed another appeal.[4] (*Id.* at ¶ 38.) Only 53 days after the Permanent Special Exception was granted, and after considerable debate, on June 5, 2003, the Commission reversed the earlier decision made by the DRB. (*Id.* at ¶ 39.) The Commission determined that the Synagogue was "too controversial," despite the fact that "controversiality" was not an enumerated factor in the City Code to be evaluated when considering a Special Exception. (*Id.* at ¶ 41, 44.) Plaintiff states that contrary to Commission procedure, Defendant Sal Oliveri was permitted to vote on his own appeal and cast the deciding vote (4–3)[5] against the Synagogue.[6] (*Id.* at ¶ 40.) Defendant Oliveri

---

2. The DRB found that use of the property as a House of Worship was compatible with the existing natural environment and other properties within the vicinity once the Applicant: (1) prohibited parking of any type in the alley located behind the Synagogue; (2) entered a lease agreement for off-site parking, (3) obtained garbage dumpsters in a size and style acceptable to City staff, (4) entered into a property maintenance agreement with a property maintenance provider who would maintain the premises in accordance with the city code, and (5) created an appropriate buffer along the rear side of the property. (D.E. 125 at ¶ 30.)

3. Plaintiff HCS does not seek liability in this action against Oliveri for his appeal. (*Id.* at ¶ 30.)

4. Plaintiff HCS does not seek liability in this action against Oliveri for his appeal. (*Id.* at ¶ 38.)

5. Plaintiff United States' Complaint contains a discrepancy in that it alleges that the Commission voted 5–2 to reverse the DRB's decision and deny HCS's petition for a third Special Exception. (Case No. 05–60687–CIV–LENARD, D.E. 1 at ¶ 27.)

6. Plaintiff HCS does not seek liability in this action against Oliveri for his vote in the Commission meeting. (*Id.* at ¶ 40.)

stated, "it's almost common sense and reasonable that the Chabad [the Synagogue] will never fit in Hollywood Hills." (*Id.* at ¶ 41.) Plaintiff United States notes that, upon information and belief, Defendant had never previously denied a request by a place of worship to operate in ether a single-family or multiple-family residential zone. (Case No. 05–60687–CIV–LENARD, D.E. 1 at ¶ 28.)

On October 16, 2003, Defendant sent HCS a letter notifying the congregation that it was to cease holding services and other related activities at its current location within one week. (*Id.* at ¶ 30.) Thereafter, Defendant Oliveri openly campaigned against the Synagogue in his 2004 campaign for City Commissioner of Hollywood Hills. (D.E. 125 at ¶ 45.) Oliveri claimed the Synagogue negatively impacted the residential neighborhood, but did not substantiate his statements with any facts. (*Id.*) At a July 2004 Commission meeting, Oliveri asked the Commission "to evict" the Synagogue and allegedly stated in support thereof, "I would just like to ask the Commission and I beg for their support for the sake of the neighborhoods here... We're talking about neighborhoods here. We're talking about neighborhoods having a smell."[7] (*Id.* at ¶ 47.) During a July 7, 2004 City Commission meeting, the Commission voted to direct the City Attorney to file a lawsuit to stop further organized religious services from taking place at HCS, despite the fact that this item was not on the agenda and no notice had been provided to HCS or the public that such a vote would take place. (Case No. 05–60687–CIV–LENARD, D.E. 1 at ¶ 32.) On or about July 16, 2004, the City filed suit against the Synagogue, in Broward County Circuit Court, Case No. 04–11444(21), seeking a declaratory judgment and injunctive relief against the Synagogue for operating as a House of Worship without a Special Exemption. (D.E. 125 at ¶ 57.)

Plaintiff HCS asserts that there are presently at least nineteen houses of worship located in Hollywood Hills residential neighborhoods: Hollywood Hills Alliance Church, Temple Sinai of Hollywood, First United Church of Christ, Hollywood Hills Church of Christ, St. George Greek Orthodox Church, Church of Jesus Christ of Hollywood Hills, Saint Andrews Presbyterian Church & Korean Mission, Temple Solel, Church of the Latter Day Saints, Hollywood Hills Methodist Church, Harvest–Time Apostolic Church, Apostolic Christian Church Nazarean, Young Israel, Westside Pentecostal Church, St. Mark's Lutheran Church, Advent Christian Cathedral, Faith Deliverance Cathedral, Hollywood Florida Congregation of Jehovah's Witness East Unit, and United Church of God. (*Id.* at ¶ 48.) Plaintiff HCS notes that both of the Jewish houses of worship listed above have been in existence for approximately 20 years and were granted Special Exceptions by previous members of the Hollywood Commission, none of whom are still members of the current Commission. (*Id.* at n. 3.) One non-Jewish house of worship is located only 0.5 miles from the Synagogue. (*Id.*) In addition, some of the above-listed houses of worship are also, similar to HCS, operated out of single family homes. (*Id.*)

Plaintiff HCS also points out that a resident, Rosa Lopez, located blocks away from the Synagogue, has for more than a decade operated a shrine to the Virgin

---

**7.** Defendant Oliveri subsequently stated that his comment was an effort to compare his efforts to protect his single family neighborhood with the City of Hollywood's efforts to protect the Hollywood Lakes section from a smelly waste treatment facility. (Am. Compl.; Ex. 11.)

Mary. (*Id.* at ¶ 51.) She takes donations from visitors, operates a commercial gift shop, and hosts as many as 4,000 people at one time. (*Id.*) The City of Hollywood has received numerous complaints regarding the traffic, noise and garbage associated with the residence and activities of Ms. Lopez, but the City has not interfered with the operation of this shrine. (*Id.* at ¶¶ 52–53.) Ms. Lopez has not requested a Special Exception. (*Id.* at ¶ 53.) When Defendant Sal Oliveri was asked by the Synagogue why Ms. Lopez was not required to obtain a Special Exception, he allegedly replied, "it's a miracle to true believers and the venue cannot be changed since the Virgin Mary visits that particular home… If you people know anything about the Catholic religion, that's called a vision. To Christians and Catholics, that is considered a miracle. That's not establishing a house of worship. That is a miracle." (*Id.* at ¶ 54.)

Plaintiff HCS further asserts that one non-Jewish house of worship operated for approximately thirteen years without having applied for, or being approved for, a Special Exception. (*Id.* at ¶ 49.) It was not until after the Synagogue inquired about unequal treatment that this house of worship applied for and was immediately granted a Special Exception. (*Id.*)

Plaintiff HCS alleges that Defendants have made no showing that perceived issues of "noise," "garbage," or "traffic" were any greater for the Synagogue than that posed by other houses of worship operating in the City. (*Id.* at ¶ 55.) HCS contends that the actions of the City, in utilizing the Commission to reverse the DRB's grant of a permanent Special Exception, were arbitrary, capricious and unreasonable. (*Id.* at ¶ 56.)

Plaintiff HCS alleges the following 18 Counts against the City in its Second Amended Complaint: 1) damages for violation of the Synagogue's right to free exercise of religion; 2) injunctive relief for violation of the Synagogue's right to free exercise of religion; 3) damages for violation of RLUIPA (42 U.S.C. § 2000cc(a)(1)—substantial burden); 4) injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(a)(1)—substantial burden); 5) damages for violation of RLUIPA (42 U.S.C. § 2000cc(b)(1)—unequal terms); 6) injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(b)(1)—unequal terms); 7) damages for violation of RLUIPA (42 U.S.C. § 2000cc(b)(2)—discrimination); 8) injunctive relief for violation of RLUIPA (42 U.S.C. § 2000cc(b)(2)—discrimination); 9) damages for violation of the Florida Religious Freedom Restoration Act of 1998 (Florida RFRA); 10) injunctive relief for violation of the Florida RFRA; 11) damages for violation of the Equal Protection Clause; 12) injunctive relief for violation of the Equal Protection Clause; 13) damages for violation of the Substantive Due Process Clause of the Fourteenth Amendment; 14) injunctive relief for violation of the Substantive Due Process Clause of the Fourteenth Amendment; 15) promissory estoppel; 16) facial equal protection challenge to Article V of the City of Hollywood Code of Ordinances; 17) as applied equal protection challenge to Article V of the City of Hollywood Code of Ordinances; and 18) preliminary injunctive relief. (D.E. 125 at ¶¶ 60–151.) Plaintiff United States' Complaint contains substantially similar facts to Plaintiff HCS's Second Amended Complaint and requests that the Court grant injunctive and declaratory relief against Defendant for violations of RLUIPA, 42 U.S.C. § 2000cc(b)(1)-(2), based on treatment of HCS on less than equal terms with nonreligious assemblies and discrimination against HCS on the basis of religion or religious denomination. (Case No. 05–60687–CIV–LENARD, D.E. 1 at 6.)

## II. Defendant's Motion to Dismiss United States' Complaint

In its Motion to Dismiss (D.E. 225), Defendant City of Hollywood moves the Court for entry of an Order dismissing Plaintiff United States' Complaint for failure to state a cause of action pursuant to Federal Rule of Civil Procedure 12(b)(6). (*Id.* at 1.) Therein, Defendant argues that Plaintiff United States asserts numerous legal conclusions unsupported by fact. (*Id.*) First, Defendant maintains that Plaintiff's Complaint alleges religious discrimination but never connects HCS's religion with any actions taken ·by or on behalf of the City. (*Id.* at 2.) Second, Defendant contends that while Plaintiff's Complaint alleges that HCS was treated on unequal terms with non-religious assemblies, there are no allegations that other religious or non-religious assemblies were treated on terms more favorable than HCS. (*Id.*) Moreover, Defendant claims that Plaintiff has failed to name any specific religious or non-religious institution other than HCS, and has further failed to allege that the other institutions were similarly situated. (*Id.*) Third, Defendant argues that, Plaintiff has failed to allege that HCS was subject to a substantial burden on its religious exercise. (*Id.* at 4.) Defendant maintains that the absence of allegations regarding any substantial burden, any similarly situated institutions, or any discriminatory enforcement of the City's zoning code is fatal to a claim for relief under RLUIPA. (*Id.* at 5.)

In its Response (D.E. 226), Plaintiff United States first argues that the jurisdictional test of RLUIPA Section (a)(2) does not apply to Section (b) claims. (*Id.* at 2.) The Government maintains that it is thus not required, as a matter of law, to allege that Defendant imposed a substantial burden on HCS's religious exercise, and that the Eleventh Circuit supports this interpretation. (*Id.* at 2–3.) To hold otherwise, contends Plaintiff, would be inconsistent with Congress's intention that RLUIPA provide broad protection of religious exercise and judicial interpretations holding that RLUIPA codifies free-exercise jurisprudence prohibiting intentional religious discrimination. (*Id.* at 4.) Moreover, the Government argues that numerous factors support an interpretation that Sections (a) and (b) are independent of one another. (*Id.* at 4–5.)

Second, Plaintiff United States contests Defendant's assertion that the Government failed to allege that any other similarly situated assembly or institution was treated more favorably than HCS. (*Id.* at 5–6.) Instead, the Government argues that it put the City of Hollywood on notice of the range of uses to be considered "similarly situated" for RLUIPA purposes when it defined HCS as an assembly or institution located in a residential district that regularly hosted more than 10 individuals for religious services. (*Id.* at 6.) Plaintiff also notes that it specifically contrasted Defendant's treatment of HCS with its treatment of other religious and nonreligious assemblies permitted to operate in residential districts without being subject to any City enforcement actions. (*Id.*) The United States maintains that this is sufficient to state a claim under RLUIPA for Rule 12(b)(6) purposes. (*Id.* at 6–7.)

Third, the United States asserts that it sufficiently alleged facts establishing that Defendant discriminated against HCS on the basis of religion. (*Id.* at 7.) The Government maintains that it identified HCS as a religious institution, described how the City of Hollywood denied it a Special Exception and sought to prevent religious worship there, and demonstrated that the City's actions constituted religious discrimination. (*Id.* at 7–8.) Moreover, the Unit-

ed States points out that its Complaint identifies the City's implementation of a time limit on HCS's Special Exception and the City's ultimate denial of a permanent Special Exception as the first such measures ever imposed on a religious institution by the City. (*Id.* at 8.) Finally, the Government maintains that it specifically alleged that Defendant's actions against HCS were motivated by HCS's religion or religious denomination. (*Id.* at 9.)

In its Reply, (D.E. 227), Defendant City of Hollywood maintains that Plaintiff United States' cursory allegations, even if true, do not support Plaintiff's cause of action. (*Id.* at 2.) Defendant reiterates that Plaintiff's failure to name specific non-religious assemblies treated on better than equal terms than HCS proves fatal to Plaintiff's claim. (*Id.*) Defendant contends that Plaintiff fails to detail any enforcement actions taken against HCS which could be said to be based upon HCS's religion or religious denomination. (*Id.*) Finally, Defendant argues that the Court should not follow the Eleventh Circuit's interpretation of RLUIPA Section (b) as independent from the jurisdictional requirements of Section (a), but should instead hold that Sections (b)(1) and (b)(2) are subsets to the general rule and thus require the showing of a substantial burden upon religious exercise. (*Id.* at 3.)

### III. Defendant's Motion to Dismiss Second Amended Complaint

In its Motion to Dismiss the Second Amended Complaint (D.E. 140), Defendant City of Hollywood argues, first, that Plaintiff Hollywood Community Synagogue lacks standing to assert a claim for compensatory damages pursuant to § 1983. (*Id.* at 6.) Defendant maintains that Plaintiff lacks associational standing to bring a claim on behalf of its members because an action for damages requires the partic-

ipation of the association's members. (*Id.* at 6–7.) Thus, Defendant contends that Plaintiff has not established a case or controversy sufficient to invoke the Court's subject matter jurisdiction. (*Id.* at 7.)

Second, Defendant argues that Plaintiff has failed to state a cause of action against the City pursuant to § 1983 because municipal liability requires a showing of a policymaker, an official policy or custom, and a violation of constitutional rights whose moving force is such policy or custom. (*Id.* at 8.) Moreover, Plaintiff must show that the municipality had actual or constructive knowledge of the custom or practice. (*Id.*) Since Plaintiff has failed to identify any policy, custom or practice deliberately chosen by Defendant which was the moving force behind constitutional violations, the City argues that Plaintiff's municipal liability claims under § 1983 must be dismissed. (*Id.* 10.)

Third, Defendant contends that Plaintiff has failed to identify any "substantial burden" on religious exercise imposed by the City, and thus HCS's claims pursuant to RLUIPA and Florida RFRA should be dismissed. (*Id.*) While HCS has alleged that the City's conduct imposes a substantial burden, the City maintains that this unspecific assertion is not supported by facts demonstrating that Plaintiff is prevented from conducting religious activities. (*Id.* at 11.) Defendant argues that Plaintiff has not shown that this is the only piece of property within the City of Hollywood where HCS can hold services, as there is nothing unique about this property, and thus Plaintiff's claim is insufficient. (*Id.*)

Fourth, Defendant argues that Plaintiff's equal protection claims pursuant to the Fourteenth Amendment should be dismissed because HCS has not alleged that any other religious organization or private business was similarly situated but treated

differently. (*Id.* at 12.) Plaintiff does not state that any other organization was granted a permanent Special Exception under similar circumstances and thus, maintains Defendant, these claims should be dismissed. (*Id.*)

Fifth, Defendant contends that Plaintiff's Substantive Due Process claims should be stricken as redundant of its equal protection and promissory estoppel claims. (*Id.*)

Sixth, Defendant argues that Plaintiff's promissory estoppel claim should be dismissed because Plaintiff does not specifically identify what expenditures it made in reliance on the representations of the DRB. (*Id.* at 13.) Since Plaintiff must identify substantial expenses incurred to support a cause of action for detrimental reliance, Defendant argues that Plaintiff has failed to state such a claim. (*Id.*) Moreover, the City maintains that HCS has not identified with any specificity which requirements it had to meet. (*Id.*)

Seventh, Defendant avers that Plaintiff's claim that the Commission is granted unbridled discretion in its zoning decisions must fail. (*Id.*) The City disputes that the Commission's discretion is unreviewable, as a process exists to appeal a Commission decision to the circuit court. (*Id.* at 13–14.) Moreover, Defendant notes that Plaintiff has participated in such a process regarding the property in question. (*Id.* at 14.) Thus, Defendant argues that Plaintiff has failed to demonstrate that Article V is void for vagueness. (*Id.*)

Finally, Defendant urges the Court to dismiss Plaintiff's claim for an injunction because such claim is unsupported by legal authority and contrary to the Federal Anti–Injunction Statute. (*Id.* at 14.) Defendant further argues that Plaintiff has not stated grounds that would entitle it to an injunction against the City. (*Id.* at 15.) Finally, Defendant argues that the proper procedure for requesting a preliminary injunction is via motion. (*Id.*)

In its Response (D.E. 144), Plaintiff HCS first argues that, rather than seeking associational standing, Plaintiff seeks to bring its claims for damages on its own behalf, for direct injuries suffered by the Synagogue. (*Id.* at 3–4.) Plaintiff maintains that the City's interference with its purpose of providing teaching and worship by arbitrary and capricious zoning enforcement, burdensome land use regulations, and purposeful harassment constitutes a direct injury in fact to HCS supporting a case or controversy. (*Id.* at 4.) HCS further alleges that the City's attempt to enjoin the Synagogue from providing a house of worship would prevent it from fulfilling its purpose, maintaining its congregation, and attracting new members or raising money. (*Id.* at 6.) Thus, Plaintiff maintains it has standing to assert claims for damages on its own behalf. (*Id.*)

Second, Plaintiff assets that it has identified three policies, any one of which would be sufficient to support a § 1983 claim for municipal liability. (*Id.*) The first policy alleged is the City's practice of routinely granting (or declining to require) Special Exceptions for houses of worship in the Hollywood Hills residential area. (*Id.* at 6–7.) The second policy arises from the single act of the Commission reversing the DRB's grant of a permanent Special Exception. (*Id.* at 7.) HCS maintains that the Commission was a final policymaker for purposes of the Supreme Court's test for when a single decision constitutes an unconstitutional policy, because no other employee of the City could review the Commission's decision. (*Id.* at 7–8.) The third policy alleged is the City's knowledge of the harassment of, and selective enforcement against, the Synagogue by code enforcement and police departments, and its failure to take action to prevent such

conduct. (*Id.* at 8.) This allegation is supported by facts in the Second Amended Complaint that the Hollywood Hills City Commissioner scolded Defendant Oliveri for his "abuse of the police force" and noted that she was troubled by selective enforcement against the Synagogue. (*Id.* at 9.) Thus, argues Plaintiff, HCS has alleged three unconstitutional policies perpetuated by the City, any one of which is sufficient to support HCS's § 1983 claim.

Third, Plaintiff argues that it has demonstrated that the City's actions constitute a substantial burden for purposes of its RLUIPA and Florida RFRA claims in that the reversal of the DRB's grant of a permanent Special Exception threatens to prevent the Synagogue from providing prayer services for its members, as required by the Jewish faith. (*Id.* at 9–10.) Further, Plaintiff maintains that the burden is on Defendant to demonstrate that its land use regulation was the least restrictive means to further a compelling government interest or that its actions constituted a "mere inconvenience" to the Synagogue. (*Id.*) Moreover, HCS argues that it has a legal right to operate a house of worship where it is because the City's Code provides for Special Exceptions for houses of worship within residential areas of the City, and that the City does not have the right to force the Synagogue to move to another location. (*Id.* at 10–11.) Finally, the Synagogue adopts the arguments of Plaintiff United States (*see supra*, pp. 11–13) with regard to the City's arguments as to HCS's Section (b)(1) and (b)(2) claims.

Fourth, Plaintiff HCS argues that it has stated a claim for relief under the Equal Protection Clause because it has demonstrated that the Synagogue was not treated the same as similarly situated landowners. (*Id.* at 12.) HCS notes that it has alleged that the Commission has granted numerous permanent Special Exceptions to similarly situated houses of worship in the Hollywood Hills residential area, that one house of worship operated for 13 years without a Special Exception, only to immediately receive one after inquiry by the Synagogue, and that Rosa Lopez has operated a house of worship without being required to obtain a Special Exception. (*Id.*) Furthermore, HCS maintains that the City, through its Commission, intentionally discriminated against the Synagogue to prevent the Synagogue from exercising its First Amendment rights. (*Id.*) In support, HCS points to certain comments made by Defendant Oliveri suggesting differential treatment based upon religious beliefs. (*Id.* at 12–13.)

Fifth, Plaintiff HCS maintains that its Substantive Due Process claims are not redundant and do not request the same relief as its Equal Protection claims. (*Id.* at 13.) The Synagogue argues that its Substantive Due Process claim stems from the City's revocation of its constitutionally-protected property interest in its permanent Special Exception. (*Id.*) HCS claims that this revocation was arbitrary and capricious, thereby rising to the level of an unconstitutional denial of property rights. (*Id.*) Furthermore, HCS argues that it has plead the elements of property interest by way of equitable estoppel because the Synagogue relied in good faith and to its detriment on the requirements set out by the DRB. (*Id.* at 13–14.)

Sixth, Plaintiff HCS argues that it has stated a claim for promissory estoppel based upon its detrimental reliance on representations of the DRB that the Synagogue would be granted both temporary and permanent Special Exceptions if it met certain conditions. (*Id.*) HCS maintains that it alleged expenditures of both time and money stemming from this reliance in its Second Amended Complaint.

(*Id.* at 14–15.) However, HCS contends that it was denied the full allotment of time to meet these conditions, indicating that the City's decision was based on factors other than the conditions set forth in its Code. (*Id.* at 15.) Further, HCS argues that the question of whether the Synagogue's expenditures were substantial in nature is a factual question, not appropriately considered in a Motion to Dismiss. (*Id.* at 16.)

Seventh, Plaintiff HCS argues that Section 5.3 of the City's Code, dealing with Special Exceptions, is void for vagueness because it lacks any objective guidelines or determinable criteria, and thus led to arbitrary and capricious zoning decisions. (*Id.* at 17.) Moreover, the Code's permissive "may" language, asserts HCS, provides the Commission unbridled discretion to reverse the grant of, or deny a Special Exception, even if the petitioner manages to satisfy the vague criteria. (*Id.*) HCS maintains that the Commission's finding that the Synagogue was too "controversial" in substantiating its revocation of the Special Exception illustrates this broad discretion to rely on any number of outside factors. (*Id.* at 17–18.) Further, HCS clarifies that Count XVII refers to a lack of meaningful administrative review of the Commission's decision, not DRB decisions. (*Id.* at 18.)

Finally, HCS argues that it has stated a claim for injunctive relief under the exception to the Anti–Injunction statute for § 1983 actions. (*Id.*) HCS maintains that the only way the Court can determine if the City violated the Synagogue's rights would be to stay the state court proceeding. (*Id.*) HCS concedes that a separate motion for temporary relief is likely required, but notes that as the City has not actively pursued declaratory or injunctive relief in the parallel state action, the Synagogue has not been required to pursue this claim seeking an injunction from this Court as to the state action. (*Id.* at 19.)

In its Reply (D.E. 145), Defendant concedes that for purposes of standing, an organization can sue in its own right. (*Id.* at 1.) However, Defendant maintains that Plaintiff has failed to allege sufficient injury in fact to meet the Article III requirements for standing. (*Id.* at 2.) Defendant argues that Plaintiff HCS has not alleged it has suffered any injury, let alone a concrete and particularized injury, and that HCS's statements in its Response regarding adverse impact on the Synagogue's ability to raise money should be disregarded because it does not appear in the Second Amended Complaint. (*Id.*) Moreover, Defendant contends that such injury is not sufficiently specific or concrete to allege an "injury in fact." (*Id.* at 2–3.) Additionally, Defendant avers that even if the Court was to find an injury in fact, Plaintiff has failed to establish that this injury is directly traceable to the City or redressable by a favorable decision. (*Id.* at 3.)

Defendant also argues that Plaintiff HCS has failed to meet the prudential requirements necessary for an organization suing on its own behalf to establish standing. (*Id.* at 4.) Defendant alleges that Plaintiff's members could assert their own rights by directly suing for any wrong they've suffered. (*Id.*)

As to Plaintiff's § 1983 claims for municipal liability based upon a City custom or policy, Defendant responds that HCS fails to allege that the City's purported policy of routinely granting Special Exceptions proximately caused a constitutional violation or meant that Special Exceptions were granted to all houses of worship that applied. (*Id.* at 5.) Defendant next asserts that the single incident of the Commission to deny Plaintiff's final application for a Special Exception cannot constitute an "of-

ficial municipal policy;" the Synagogue must show that this incident was pursuant to a separate "official municipal policy." (*Id.* at 5–6.) Finally, Defendant maintains that failing to prevent monitoring by police officers and code officers could not engender § 1983 municipal liability because such actions do not constitute "known constitutional violations." (*Id.* at 6.)

For purposes of Plaintiff's RLUIPA claims, Defendant maintains that Plaintiff has still failed to identify any "substantial burden." (*Id.*) While noting that the Eleventh Circuit has not directly addressed whether the jurisdictional requirement of a "substantial burden" from RLUIPA § (a) applies to § (b), Defendant cites cases from other Districts supporting its argument that such a showing is required under both sections. (*Id.* at 7–8.) As to HCS's Florida RFRA claims, Defendant argues that neither the City nor the Commission ever prevented the Synagogue from providing prayer services for its members, nor did Plaintiff ever allege such prevention in its Second Amended Complaint. (*Id.* at 8.)

As to Plaintiff HCS's Equal Protection claims, Defendant reiterates that Plaintiff has not met the requirement of alleging that other similarly situated houses of worship received disparate treatment. (*Id.* at 9.) Defendant notes that the words "similarly situated" do not appear in either Equal Protection count and Plaintiff has failed to allege facts showing that the Synagogue was similarly situated to other houses of worship. (*Id.*)

Defendant also argues that Plaintiff HCS likewise failed to allege that it was similarly situated for purposes of its Substantive Due Process claims. (*Id.*) Moreover, Defendant argues that Plaintiff has failed to allege detrimental reliance with any specificity for equitable estoppel purposes and has also failed to demonstrate

that the Synagogue acquired any rights through the DRB decision which were later destroyed. (*Id.* at 9–10.)

Defendant relies on its previous arguments in support for dismissal of Plaintiff's Promissory Estoppel and Void for Vagueness claims. (*Id.* at 10.) As for Plaintiff's request for an injunction of the state court proceedings, Defendant maintains that it has not sought to enjoin Plaintiff from conducting a house of worship at any other properly zoned location within the City, and thus Plaintiff has not shown it is likely to succeed on the merits. (*Id.*)

## IV. Standard of Review

In the context of a motion to dismiss, the Court accepts as true facts alleged in the Complaint, and construes them in a light favorable to Plaintiff. *Bank v. Pitt,* 928 F.2d 1108, 1109 (11th Cir.1991). Moreover, a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that Plaintiff can prove no set of facts in support of its claim which would entitle it to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Defendant has moved to dismiss each of Plaintiff United States' claims and 16 of Plaintiff HCS's 18 claims for relief, and the Court will therefore address each in turn.

## V. Analysis of Defendant's Motions

The Court will now address each of the claims raised in Defendant City of Hollywood's Motion to Dismiss the Second Amended Complaint and Defendant City's Motion to Dismiss Plaintiff United States' Claims.

### A. Standing

■ Before addressing Plaintiff HCS's substantive claims, the Court must first determine whether the Synagogue has

standing to bring this action on its own behalf or on behalf of its members. The Supreme Court has held that Article III of the Constitution limits the federal judicial power to "Cases" or "Controversies," thus requiring that there be at least (1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision. *See, e.g., United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 551, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996); *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville,* 508 U.S. 656, 663, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). The threshold question is, therefore, whether the plaintiff has directly "suffered some threatened or actual injury resulting from the putatively illegal action" to warrant invocation of federal court jurisdiction. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), *quoting Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973).

▪ Aside from these minimum constitutional requirements, the Supreme Court has recognized prudential limits on the class of persons who may invoke the courts' decisional and remedial powers. Thus generally, absent a Congressional grant of standing, a plaintiff must also assert his own legal rights and interests, and not rest his claim to relief on the legal rights or interests of other parties. *See Warth,* 422 U.S. at 499, 95 S.Ct. 2197.

Here, Plaintiff HCS expressly rejects any claim of associational standing, asserting instead that it has standing to bring this action on its own behalf for direct injuries suffered by the Synagogue. The Supreme Court has held that, "[t]here is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Id.* at 511, 95 S.Ct. 2197. Moreover, an association suing on its own behalf can assert the rights of its members so long as the challenged conduct impinges on its members' associational ties. *Id.* The test for standing of an association suing on its own behalf is the same as in the case of an individual, namely, whether the plaintiff has alleged such a personal stake in the outcome of the action as to justify exercise of the court's remedial powers on its own behalf. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Warth,* 422 U.S. at 498–99, 95 S.Ct. 2197.

Defendant City of Hollywood argues that HCS fails to meet both the Article III and the prudential requirements to assert a § 1983 claim. Defendant asserts that Plaintiff fails to allege that it suffered an injury in fact, that the injury is traceable to the actions of Defendant, or that its injury would likely be redressed by a favorable decision on the merits. Defendant maintains that frustration of the Synagogue's objections is the type of abstract concern that does not impart standing, and neither will a speculative or nonspecific injury, such as difficulty raising money, suffice. Additionally, Defendant posits that Plaintiff HCS has failed to meet the prudential requirements of standing because it is resting its claims on wrongs suffered by its members, where the members could sue on their own behalf for any alleged constitutional violations of their rights.

Plaintiff HCS, on the other hand, argues that its claims are based upon the City's interference with its purpose of providing teaching and worship through the City's

arbitrary and capricious zoning enforcement, burdensome land use regulations, and purposeful harassment of and selective enforcement against the Synagogue. The Synagogue alleges in the Second Amended Complaint that the City's reversal of the grant of a permanent Special Exception and the initiation of litigation to enjoin the Synagogue from providing teaching and worship has unreasonably limited the Synagogue's activities and will prevent the Synagogue from fulfilling its purpose or building its congregation. (D.E. 125 at 24.)

The primary question at the heart of the standing issue is whether Plaintiff HCS has alleged a sufficiently specific and immediate, rather than abstract and speculative, injury in fact to invoke federal jurisdiction. In *Havens,* the Supreme Court had occasion to address a similar issue when HOME, a non-profit organization whose purpose was to make equal opportunity in housing a reality in the Richmond Metropolitan Area, sued an owner of an apartment complex, alleging its efforts had been frustrated by defendant's racial steering practices. 455 U.S. at 379, 102 S.Ct. 1114. The Court held that if the apartment owner's steering practices had perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home-seekers, the organization had suffered an injury in fact. *Id.* The Court further held that such a concrete injury and subsequent drain on the organization's resources constituted far more than simply a setback to the organization's abstract social interests. *Id.*

■■■ The Court finds that the Synagogue has similarly alleged that the City's reversal of its permanent Special Exception and the selective enforcement and harassment by the City's police officers and code enforcers has substantially interfered with HCS's activities and its purpose. Such conduct adversely affects the Synagogue's ability to provide teaching and worship to its members, and creates a drain on its resources. Therefore, the Court finds that the Synagogue has alleged a sufficient injury in fact to create standing for the Synagogue to challenge such conduct on its own behalf. *See Florida Democratic Party v. Hood,* 342 F.Supp.2d 1073, 1079 (N.D.Fla.2004) ("an organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes"), *citing Havens,* 455 U.S. at 379, 102 S.Ct. 1114. The Court finds that the Synagogue has likewise alleged a causal connection between the City's activities and this injury, and that a favorable decision on the merits in this action will provide redress to HCS in the form of damages to replace its drained resources and the potential for an injunction to prevent the City from inflicting future injuries. The Court finds the City's arguments to the contrary disingenuous. Moreover, there is no question that the prudential requirements for standing have been met. The Synagogue is the proper party to bring this action based upon direct injury to the organization from an ongoing pattern of discrimination and harassment against the City; the Synagogue's individual members suing over parking tickets would in no way address these allegations or adequately represent the Synagogue's interests in this controversy.

**B. Counts I and II— § 1983 claims for violation of the First and Fourteenth Amendments**

In Counts I and II of the Second Amended Complaint, Plaintiff HCS alleges violations of its constitutional rights pursu-

ant to 42 U.S.C. § 1983.[8] In these counts, the Synagogue alleges that the City's official harassment of HCS, its denial of the Special Exception, and its action to obtain injunctive and declaratory relief against the Synagogue violated the Synagogue's constitutional rights to free exercise of religion and freedom of assembly for purposes of worship and teaching.[9] (D.E. 125 at 19.)

In order to state a claim for relief under § 1983, Plaintiff must demonstrate that conduct under color of state law, complained of in the civil rights suit, violated its rights, privileges, or immunities under the Constitution or laws of the United States. *Whitehorn v. Harrelson,* 758 F.2d 1416, 1419 (11th Cir.1985). Additionally, while *Fed.R.Civ.P.* 8 provides a plaintiff considerable leeway in framing its complaint, the Eleventh Circuit, along with others, has tightened the application of Rule 8 with respect to § 1983 cases in an effort to weed out nonmeritorious claims, requiring the plaintiff in such cases to allege with some specificity the facts which make out its claim. *GJR Investments, Inc. v. County of Escambia, Fla.,* 132 F.3d 1359, 1367 (11th Cir.1998).

Moreover, the Supreme Court has placed strict limitations on municipal liability under section 1983. *Gold v. City of Miami,* 151 F.3d 1346, 1350 (11th Cir. 1998), *citing Monell v. Department of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). There is no respondeat superior liability upon which to inculpate a municipality for the wrongful actions of its employees or agents. 436 U.S. at 691, 694, 98 S.Ct. 2018. Thus, a municipality can only be held liable if an official policy or custom of that municipality causes a constitutional violation. *Monell,* 436 U.S. at 694–95, 98 S.Ct. 2018. Moreover, it is not enough for the plaintiff to merely identify conduct properly attributable to the municipality; the plaintiff must also demonstrate that, through deliberate conduct, the municipality is the moving force behind the alleged injury. *Board of County Com'rs v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Defendant argues that Plaintiff HCS's § 1983 claims based on violations of Plaintiff's rights to free exercise of religion and freedom of assembly should be dismissed because the Synagogue has failed to identify, generally or specifically, any custom, policy or practice that is the moving force behind Plaintiff's alleged injuries. Plaintiff responds that it has alleged three policies or practices of the City that satisfy the requirements for municipal liability: (1) the City's history of routinely granting Special Exceptions to house of worship in the Hollywood Hills residential areas; (2) the single act by the Commission of reversing the DRB's grant of a permanent Special Exception pursuant to the authority granted by the City's zoning ordinances, and (3) the pattern of improper police conduct of harassment and selective enforcement against the Synagogue which the City was aware of and failed to prevent. The Court will address each in turn.

As to the first alleged policy, that the City routinely grants Special Exceptions, the Court begins by noting that there is very little factual support contained in the Second Amended Complaint for the infer-

---

**8.** As is the case with nearly all of its claims. Plaintiff HCS divides its § 1983 claim into two counts, one seeking damages, and the other seeking injunctive relief.

**9.** To the extent that the Synagogue also alleges violations of its substantive due process rights and equal protection rights in Counts I and II (D.E. 125 at 20), these claims are redundant and will be addressed solely in Counts XII, XIII, XIV, and XV.

ence that the City grants most or all applications for Special Exceptions for houses of worship that it considers. Though the Synagogue refers to multiple other houses of worship in the Hollywood Hills area, it fails to specify if they are likewise located in areas zoned for single-family residences or if and when they were granted Special Exceptions.[10] However, even if the Court were to find such a policy existed, it is entirely unclear how this policy could have been the moving force behind the injuries suffered by the Synagogue. If anything, a policy of routinely granting Special Exceptions would be the proximate cause of the granting of a Special Exception for HCS, rather than the denial by the City. Thus, this policy is insufficient to establish municipal liability.

Plaintiff's second argument is that the single act by the Commission of reversing the DRB pursuant to the City's zoning ordinances is sufficient to invoke municipal liability, pursuant to the Supreme Court's holding in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). The Court in *Pembaur* held that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. *Id.* at 480, 106 S.Ct. 1292. However, any such single act must still be made pursuant to an existing, unconstitutional official municipal policy to properly attribute such conduct to the municipality pursuant to *Monell. Id.* at 478 n. 6, 479–81, 106 S.Ct. 1292; *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–824, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

█ The Eleventh Circuit has summarized the guiding principles laid out by the Supreme Court to evaluate whether the single action of an official policymaker is sufficient to give rise to municipal liability,

as follows: (1) whether the action is officially sanctioned or ordered by the municipality; (2) whether the action is taken by officers with final policymaking authority; (3) whether this final policymaking authority is granted by state law, including valid local ordinances and regulations; (4) whether the challenged action was taken pursuant to a policy adopted by the officials responsible for making policy in that particular area of the city's business, as determined by state law. *Martinez v. City of Opa–Locka,* 971 F.2d 708, 713 (11th Cir.1992) (citations and quotation marks omitted).

█ Here, Plaintiff HCS has alleged that the decision of the Commission, in overturning the granting of a conditional permanent Special Exception by the DRB, acted in its capacity as final policymaking authority, pursuant to the City of Hollywood Code of Ordinances and Zoning and Land Development Regulations ("ZLDR"). (D.E. 125 at ¶ 61.) The Synagogue further alleges that Commission decisions are attributable to the City because such decisions are not subject to meaningful administrative review. (*Id.* at ¶ 62.) Finally, the Synagogue states that the Commission's arbitrary and capricious decision deprived HCS of its First Amendment rights. (*Id.* at ¶¶ 66–67.)

Plaintiff also provides the text of Sections 5.3 and 5.7 of the City's ZLDR, governing Commission requests for review of DRB decisions on Special Exception applications. (*Id.* at ¶¶ 138–39.) These provisions demonstrate that the Commission is authorized by local ordinances to review decisions by the DRB and either approve, approve with conditions, or deny an application for a Special Exception. They also demonstrate that this review is to be conducted pursuant to four subjective criteria,

---

**10.** Defendant has noted that Special Exceptions were not required prior to 1994.

the same standards used by the DRB in its initial decision, and that the Commission still has the discretion to deny the Special Exception, even if all of these criteria are met.

Thus, Plaintiff has satisfied all four factors from *Martinez* for evaluating whether a single official act constitutes municipal liability. First, as HCS alleges the Commission's reversal was undertaken pursuant to Sections 5.3 and 5.7 of the City's ZLDR, the Synagogue has alleged that the Commission's decision was officially-sanctioned. Second, since the Synagogue has alleged that no other city employee could review this decision, it has alleged an action taken by officials with final policymaking authority. *See Martinez*, 971 F.2d at 715 (local law is determinative of who is an official policymaker; thus, when City Manager was vested by the City's charter with discretionary authority unreviewable by another city employee, the Manager had final decisionmaking authority). Third, the City's local ZLDR, as controlling local law, further bolsters the allegation that the Commission had final policymaking authority. Finally, the Synagogue has alleged that the Commission's reversal was taken pursuant to the official municipal policy granting the Commission review of DRB decisions. Sections 5.3 and 5.7 demonstrate that this policy provides the Commission with complete discretion to deny Special Exceptions for any reason whatsoever, thus allowing the Commission to regulate houses of worship without objective and precise criteria, in violation of the First Amendment rights of these assemblies. *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir.1999); *see also infra* at 1326 – 1328. Such policy was adopted by the Commission, which ZLDR Sections 5.3 and 5.7 demonstrate is responsible under local law for effectuating policy in the area of local zoning and development regulation. Thus, the Synagogue has met the fourth and final factor articulated in *Martinez*. Therefore, Plaintiff HCS has stated a claim for relief under § 1983 pursuant to the Commission's decision to reverse the DRB's grant of a permanent Special Exception.

■ The Synagogue also alleges a third policy: that the City knew of a pattern of harassment and selective enforcement via its police officers and code enforcers, and that the City did nothing to halt such actions. The Second Amended Complaint alleges that City Commissioner Sal Oliveri began, in late 2001 or early 2002, regularly contacting the City's code enforcement and/or police departments, in order to enlist their services to harass the Synagogue and its members. (D.E. 125 at 9.) Attached as Exhibit A to the Complaint is a memorandum from Oliveri to the former Director of Economic Development and Development Administration stating that "careful and vigilant monitoring" of the Synagogue was required. (*Id.* at 9–10, Ex. A.) Attached as Exhibit B to the Complaint are emails from various City officials showing that the Synagogue's properties were inspected daily. (*Id.* at 10, Ex. B.) The Synagogue also alleges that Oliveri told code enforcement and police officers to only issue tickets to cars parked on the Synagogue's properties. (*Id.*) Exhibits C and D reflect the results of this frequent inspection and Oliveri's request for monthly reports of police and code enforcement activity at the Synagogue. (*Id.* at 10, Ex. C, D.) The Synagogue further provides evidence that such behavior was well known to City officials, citing City Commissioner Cathy Anderson's public scolding of Oliveri for abuse of City resources in constantly checking on the Synagogue and her comment that, "[w]hat we have here is selective enforcement and I'm very troubled by it." (*Id.* at 22, Ex. K.)

In short, the Synagogue has provided ample evidence of a City policy and practice of harassment and selective enforcement against the Synagogue, and further demonstrated that nothing was done to prevent this conduct despite the fact that such policy was well known or should have been well known to City officials. The Eleventh Circuit has held that, "the continued failure of the city to prevent known constitutional violations by its police force is precisely the type of informal policy or custom that is actionable under section 1983." *Depew v. City of St. Marys, Georgia*, 787 F.2d 1496, 1499 (11th Cir.1986). Such policy is sufficient to constitute the moving force behind the Synagogue's injuries. *See Griffin v. City of Opa–Locka*, 261 F.3d 1295, 1312 (11th Cir.2001) (City's tolerance of gross sexual harassment and failure to take action despite actual and constructive knowledge of the problem constituted a moving force behind sexual harassment at the City).

However, the City argues that the City's actions of constant monitoring and checking do not constitute "known constitutional violations" for purposes of a § 1983 claim. The Court finds this argument entirely contrary to prevailing case law. In *Bennett v. Hendrix*, 423 F.3d 1247 (11th Cir. 2005), the Court of Appeals held that, "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* at 1254. The Court went on to hold that a prolonged and organized campaign of harassment by local police officers was sufficiently adverse that a jury could find they would chill a person of ordinary firmness form exercising his or her First Amendment rights. *Id.* at 1254–55.

Here, Plaintiff HCS has alleged a violation of its First Amendment rights to free exercise of religion and right to free assembly. The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging . . . the right of the people peaceably to assemble . . . ," U.S. Const., amend. I, cl. 1, and is applicable to the states and their subdivisions through the Fourteenth Amendment. *Employment Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The guarantee of free exercise of religion grants citizens the right to believe and profess whatever religious doctrine they choose, and thus forbids government regulation of religious beliefs as such. *Id.* The Clause further prohibits government from imposing special disabilities on the basis of religious views or status or otherwise interfering with the practice of religious beliefs. *Id.*

Thus, the Supreme Court has held that the Clause forbids, not just facially discriminatory laws or official practices, but "subtle departures from neutrality" and "covert suppression of particular religious beliefs." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (citations omitted). Thus, the Court held that official action which had as its main object the suppression of a central element of the Santeria religion constituted a "religious gerrymander" and an impermissible attempt to target petitioners and their religious practices. *Id.* At 535 (citations omitted).

The Supreme Court has also recognized the freedom of assembly as a fundamental First Amendment right. *Bates v. City of Little Rock*, 361 U.S. 516, 527, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960). Contained within this right is the freedom to associate for purposes of engaging in the exercise of religion. *Id.; Roberts v. United States*

*Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984). The Constitution guarantees freedom of association as an indispensable means of preserving other individual liberties. *Id.*

Numerous courts have found that harassment in the form of constant monitoring, investigating or issuance of violations can contravene First Amendment rights. *See Garcia v. City of Trenton,* 348 F.3d 726, 729 (8th Cir.2003) (retaliatory issuance of parking tickets totaling $35 created a jury issue because defendant "engaged in the punitive machinery of government in order to punish Ms. Garcia for her speaking out") (citations omitted); *Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 828 (11th Cir.1982) (city commissioners' formation of building code task force which conducted frequent inspections of designated hotels and issued numerous violations, and which was designed to harass and drive hotels out of business, was sufficient to state a § 1983 claim); *Georgia Association of Educators v. Gwinnett County School District,* 856 F.2d 142, 145 (11th Cir.1988) (holding the Government may not retaliate against individuals or associations exercising their First Amendment rights "by imposing sanctions for the expression of particular views it opposes"); *Word of Faith Fellowship, Inc. v. Rutherford County Dep't of Social Services,* 329 F.Supp.2d 675, 693 (W.D.N.C.2004) (parents had alleged basis for municipal liability on allegations that county officials engaged in prolonged campaign to undermine church and interfere with members' religious practices through series of investigations).

The Court finds that the City's alleged conduct in the instant case of ticketing only cars parked on the Synagogue's side of the street could reasonably engender the discouragement of Synagogue members wishing to attend prayer services.

Thus, Plaintiff has stated a claim for relief in Counts I and II for municipal liability pursuant to § 1983 violations of Plaintiff's rights to free exercise of religion and freedom of assembly. However, such claims relate only to the Commission's decision to reverse the DRB's grant of a permanent Special Exception and to the City's alleged policy of allowing or encouraging harassment and selective enforcement against the Synagogue; the other claims based on Counts I and II are dismissed, consistent with this Order.

## C. Counts IV, V, VI, VII, VIII, IX, X, and XI—RLUIPA AND Florida RFRA Claims

In Plaintiff HCS's Counts IV through IX and in Plaintiff United States' Complaint, Plaintiffs allege violations of various provisions of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc et seq. Defendant City of Hollywood has moved to dismiss all such Counts based upon its assertion that all require a showing that the City imposed a substantial burden on Plaintiff's religious exercise, and Plaintiffs have failed to satisfy this requirement. The Court finds the facts alleged in Plaintiff United States' Complaint to be sufficiently similar to those alleged in the Plaintiff HCS's Second Amended Complaint that it may handle Defendant's objections to Plaintiffs' claims together.

### 1. Substantial Burdens Provision

 The Synagogue's first RLUIPA claims, Counts IV and V, are made pursuant to section (a)(1), the "substantial burdens" provision. This provision states,

[n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, un-

less the government demonstrates that imposition of the burden on that person, assembly or institution—(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). Section (a)(1) only applies when at least one of three jurisdictional tests is met: (A) the substantial burden is imposed in a federally-funded program or activity; (B) the substantial burden affects, or removal of that burden would affect interstate or foreign commerce; or (C) the substantial burden is imposed in the implementation of a land use regulation or system of regulations in which the government makes individualized assessments of the proposed uses for the property involved. 42 U.S.C. § 2000cc(a)(2). "Land use regulation" is defined as a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5).

Here, Plaintiff HCS alleges that it is the owner in fee simple absolute of two properties used as houses or worship, teaching, and discourse. (D.E. 125 at ¶ 6.) The City of Hollywood's Zoning and Land Development Code limits the use and development of land where these properties are located to single family detached dwellings. (*Id.* at ¶ 11). Petitions for Special Exceptions to operate places of worship may be filed with the City's Development Review Board by the owners of properties within Single Family Districts. (*Id.*) The DRB hears each such Petition on a case-by-case basis pursuant to the City's quasi-judicial procedures, and may grant the Petition if various findings are made regarding compatibility with environment, provisions for safe traffic movement, and controls for nuisances. (*Id.* at 6–7.) HCS alleges that this procedure incorporates an improper system of individualized, arbitrary and potentially discriminating assessments. Thus, based on HCS's allegations, jurisdiction in this case is appropriate under the "individualized assessment" prong of RLUIPA's jurisdictional tests. 42 U.S.C. § 2000cc(a)(2)©.

The general rule of RLUIPA is that state action substantially burdening "religious exercise" must be justified as the least restrictive means of furthering compelling governmental interest. *Id.* at §§ 2000cc(a)(1), 2000cc-1(a); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir.2004). "Religious exercise" is defined by RLUIPA to include the "use, building, or conversion of real property for the purpose of religious exercise," 42 U.S.C. § 2000cc-5(7)(B). In passing RLUIPA, Congress recognized that places of assembly are needed to facilitate religious practice and that governments may use zoning regulations to prevent religious organizations from using land for these purposes. *Midrash*, 366 F.3d at 1226. Thus, the regulations at issue in this case clearly impact "religious exercise" as contemplated by RLUIPA. *See id.* However, Defendant City of Hollywood argues that Plaintiff Hollywood Community Synagogue has not demonstrated that the regulation in question substantially burdens this religious exercise. The Court will now address this question.

Because RLUIPA does not offer a definition for "substantial burden," a reviewing court is to give the terms their ordinary or natural meaning. *Id.* Combining this principle with the Supreme Court's instructional definition of "substantial burden" within its free exercise cases, as well

as that of other courts, the Eleventh Circuit held that a substantial burden, "must place more than an inconvenience on religious exercise... [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id.* at 1227.

Here, Defendant argues that Plaintiff has not plead facts sufficient to meet this standard. Defendant City maintains that is has merely precluded the Synagogue from holding services in an area not zoned for such activity when the Synagogue may relocate to other areas that are zoned for such activity. It contends that Plaintiff has not alleged that their property is unique or the only suitable property to hold services, and further that Plaintiff has never specifically stated what substantial burden is being imposed upon the Synagogue. Thus, Defendant City argues that Plaintiff's claims under the "substantial burdens" provisions must be dismissed because Plaintiff has stated nothing more than a mere inconvenience.

Plaintiff HCS responds that the City's reversal of the permanent Special Exception, and subsequent initiation of a state suit for injunctive relief to shut down the Synagogue, constitutes a substantial burden and not a mere inconvenience. HCS argues that it has a legal right to operate a house of worship where it is because the City's Code provides for Special Exceptions for houses of worship within residential areas of the City. The Synagogue alleges that requiring it to relocate would adversely impact its ability to continue providing religious teaching and worship to the community (D.E. 125 at ¶ 87); however, the Synagogue explicitly declines to assert a substantial burden based upon increased walking distance for its members resulting from relocation. (D.E. 144 at 11.)

The Court in *Midrash* had the opportunity to review an analogous set of facts when it considered whether the Town of Surfside's zoning ordinance that would require a synagogue to relocate imposed a substantial burden. 366 F.3d at 1227–28. The Court first found that the fact that congregations may not be able to find suitable alternative space did not create a substantial burden within the meaning of RLUIPA. *Id.* at 1227 n. 11. Next, the Court found that requiring a congregation to apply for a Conditional Use Permit (CUP) did not constitute a substantial burden because it allowed the zoning commission to consider factors such as size, congruity with existing uses, and availability of parking. *Id.* The Court noted that, "[w]e have found that such reasonable 'run of the mill' zoning considerations do not constitute substantial burdens on religious exercise." *Id.* (citations omitted). Finally, the Court held that the Town of Surfside had not placed a substantial burden upon the synagogue by requiring it to relocate and forcing its members to walk a few additional blocks. *Id.* at 1228. The Court found significant the facts that the synagogue's current location held no particular religious significance, that the synagogue could apply for a permit to operate only a few blocks away, and that municipalities would find it nearly impossible to ensure that no individual would be burdened by the walk to a temple of choice. *Id.*

The plaintiff bears the burden of persuasion on whether the government practice in question substantially burdens plaintiff's exercise of religion. 42 U.S.C. § 2000cc–2(a), (b); *Midrash,* 366 F.3d at 1225. In this case, the Court cannot determine that Plaintiff has met its burden of demonstrating that the City's denial of a Special

Exception has substantially burdened its religious exercise. The Synagogue has not shown that its property carries unique religious significance or that other properties are not available that could accommodate its practices. Instead, the Synagogue has merely offered vague and conclusory statements that it has a "legal right" to be granted a Special Exception and that relocation would substantially burden its ability to continue to provide religious teaching and worship to the community. Such bare and unspecific assertions are insufficient to support Plaintiff's claims under RLUIPA section (a)(1). *Fed.R.Civ.P.* 8(a), (e). Moreover, given the Eleventh Circuit's holding in *Midrash,* the Court cannot conclude that the City's process of requiring a Special Exception constitutes a substantial burden under RLUIPA. Plaintiff's claims under RLUIPA section (a)(1) must be dismissed.

### 2. Equal Terms and Nondiscrimination Provisions

■ Plaintiff HCS's Counts VI and VII and Plaintiff United States' first claim is made pursuant to RLUIPA section (b)(1), the "equal terms" provision. This provision states, "[n]o government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). The Eleventh Circuit held that the "natural perimeter" for consideration under this section is the category of "assemblies and institutions." *Midrash,* 366 F.3d at 1230. Thus, the *Midrash* Court first evaluated whether the plaintiff had made allegations that other entities were qualified as assemblies or institutions before considering whether such nonreligious entities were treated differently than religious assemblies or institutions. *Id.* Finding that an assembly was "a group gathered for a common purpose,"

the Court in *Midrash* went on to find that the plaintiff had properly alleged that private clubs and lodges were assemblies or institutions under RLUIPA, and thus could not be treated differently from religious assembles. *Id.* at 1231.

Here, Plaintiff HCS alleges that the City has granted Special Exceptions to day care centers and educational facilities, while denying the Synagogue a Special Exception. Plaintiff United States alleges that the City currently permits other nonreligious assemblies and institutions to operate in residential districts in violation of zoning ordinances and without being subjected to any enforcement action for such violation. Though these allegations are cursory at best, they are sufficient to allege the required nonreligious assemblies or institutions for Plaintiffs' equal terms claims to survive Defendant's Motions.

■ Plaintiff's Counts VIII and IX and Plaintiff United States second claim are made pursuant to RLUIPA section (b)(2), the "nondiscrimination" provision. This provision states, "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Plaintiff HCS alleges that there were ten other house of worship Special Exception applications filed with the City in the last twenty years, and not one except the Synagogue's was denied. (D.E. 125 at ¶ 99.) Plaintiff United States alleges that Defendant had never previously denied a request by a place of worship to operate in either a single-family or multiple-family residential zone until it denied HCS's Special Exception application. (Case No. 05–60687–CIV–LENARD, D.E. 1 at ¶ 28.)

Defendant argues that both Plaintiffs' equal terms and nondiscrimination claims

should be dismissed because Plaintiffs have not alleged any facts giving rise to a substantial burden on religious exercise. Citing numerous opinions from other district courts, Defendant argues that the jurisdictional tests and substantial burden requirements of section (a) of RLUIPA also apply to section (b). Defendant argues that while the Eleventh Circuit, in *Midrash,* suggested that section (a)(1)'s threshold jurisdictional tests do not apply to section (b)(1)'s equal terms provision, the Court did not actually reach this issue.

Plaintiff United States (and Plaintiff HCS, in adopting the United States' argument) argues that nothing in the text of RLUIPA supports the proposition that a substantial burden showing is required for a § (b) claim. (Case No. 04–61212–CIV–LENARD/KLEIN, D.E. 226 at 3.) Plaintiff maintains that while § (a) regulates substantial burdens upon religious exercise, and thus the jurisdictional tests are appropriate, § (b) was intended to provide broad protection for discriminatory government action, regardless of its substantiality. (*Id.* at 3–4.)

Though the Court recognizes that the Eleventh Circuit did not actually decide the issue of whether RLUIPA's jurisdictional and substantial burden tests apply to sections (b)(1) and (b)(2), the *Midrash* Court's extensive discussion of the issue is illustrative. In *Midrash,* the Court noted that, "[t]he plain terms and structure of RLUIPA indicate that the jurisdictional prerequisites included in § (a)... do not apply to § (b)'s prohibition on discrimination against and exclusion of religious institutions." 366 F.3d at 1229. In support, the Eleventh Circuit cited the fact that, 1) § (b) *is silent as to jurisdictional tests* while three jurisdictional tests are enumerated in § (a); 2) section (a)(2), by its terms, specifically applies to "subsection" (a); and 3) the language regarding sub-

stantial burdens in the jurisdictional tests is consistent with an application to § (a)'s prohibition on substantial burdens. *See id.* The Court went on to state that while, "RLUIPA'S text and structure suggest that § (a)(2)'s threshold jurisdictional test does not apply to § (b)'s equal terms provision," it did not reach the question because it found that, regardless, the third jurisdictional prong of § (a)(2) had been satisfied. *See id.*

However, the Court notes that the Seventh Circuit has had the opportunity to reach this issue. In *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752, 762 (7th Cir.2003), the court found that the substantial burden and nondiscrimination provisions were operatively independent of one another. The court read RLUIPA as "afford[ing] a government the discretion to take corrective action to eliminate a nondiscrimination provision violation, whether or not it was the result of a substantial burden on religious exercise." *Id.*

The Court agrees with the holding of the Seventh Circuit and the reasoning of the Eleventh Circuit that the text and structure of RLUIPA support a finding that § (b) is operatively independent of the jurisdictional prerequisites of § (a). The Court finds persuasive the facts that § (a) states that it applies only to "subsection" (a) while § (b) is silent as to jurisdictional tests and that § (a)'s prohibition of substantial burdens on religious exercise is consistent with the substantial burden language in the jurisdictional tests. As Defendant can cite no persuasive authority that suggests otherwise, the Court finds that Plaintiffs need not allege a substantial burden to state claims under RLUIPA §§ (b)(1) and (b)(2).

Additionally, Defendant argues that Plaintiff United States' nondiscrimination claim should be dismissed because it fails

to connect any alleged discrimination suffered with HCS's religious affiliation. The Government responds that it adequately connected the alleged discrimination with HCS's religious affiliation by identifying HCS as a religious institution, describing how the City of Hollywood denied it a Special Exception and sought to prevent religious worship there, and identifying the City's implementation of a time limit on HCS's Special Exception and the City's ultimate denial of a permanent Special Exception as the first such measures ever imposed on a religious institution by the City. (Case No. 04–61212–CIV–LE-NARD/KLEIN, D.E. 226 at 7–9.) The Court finds that Plaintiff United States has sufficiently alleged facts, including the denial of a Special Exception and the selective enforcement against the Synagogue, to make out a claim that Defendant discriminated against HCS on the basis of its religious affiliation.

Accordingly, Defendant's Motion to Dismiss the Second Amended Complaint, as it applies to RLUIPA sections (b)(1) and (b)(2), and Defendant's Motion to Dismiss Plaintiff United States' Complaint are denied.

### 3. Florida RFRA Claims

Plaintiff HCS's Counts X and XI are made pursuant to § 761.03 of the Florida Religious Freedom and Restoration Act (Florida RFRA). Section 761.03 states,

[t]he government shall not substantially burden a person's exercise of religion, even if the burden results from a rule of general applicability, except that governments may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person: (a) Is in furtherance of a compelling governmental interest; and (b) Is the least restrictive means of fur-

thering that compelling governmental interest.

Fla. Stat. § 761.03(1). Defendant argues that Plaintiff's Florida RFRA claims should be dismissed because, similar to its RLUIPA claims, Plaintiff fails to identify a "substantial burden."

The Florida RFRA was modeled after the federal RFRA and made the compelling state interest test from federal jurisprudence applicable to state cases involving questions of the free exercise of religion. *Warner v. City of Boca Raton,* 887 So.2d 1023, 1031–32 (Fla.2004.) In *Warner,* in response to two questions certified by the Eleventh Circuit Court of Appeals, the Florida Supreme Court held that the Florida RFRA is broader than United States Supreme Court precedent because the Florida RFRA applies a compelling interest test to neutral laws of general application and the "exercise of religion" definition includes any act or refusal to act, whether or not compelled by or central to a system of religious belief. 887 So.2d at 1032. However, the court stopped short of holding that any act by an individual motivated by religion is subject to the compelling state interest test, finding instead that only government regulations which "substantially burden" a person's exercise of religion are subject to the test. *Id.* at 1033.

After considering various definitions of "substantial burden" adopted at the federal level, the court in *Warner* settled upon the narrow definition adopted by the Fourth, Ninth, and Eleventh Circuits. *Id.* Thus, a substantial burden on the free exercise of religion under the Florida RFRA, "is one that either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires." *Id.* As the Court previously found that Plaintiff had not demonstrated

a substantial burden under this same standard for RLUIPA purposes, the Court likewise finds that Plaintiff's Florida RFRA claims fail to state a claim upon which relief may be granted. Accordingly, Counts X and XI are dismissed.

### D. Count XII and XIII—Equal Protection Claims

In Counts XII and XIII, Plaintiff HCS alleges violations of its constitutional right to equal protection under the Fourteenth Amendment. The Synagogue alleges that it was treated less favorably than other houses of worship in the residential areas of the City. (D.E. 125 at ¶ 114.) Plaintiff also contends that the Commission failed to consider the least restrictive means to address issues of traffic, noise and garbage. (*Id.* at ¶ 117.) Moreover, Plaintiff alleges that the City, through Oliveri, selectively enforced the Code by directing its code enforcement officers to check for violations on a daily basis and only ticket cars parked in front of the Synagogue's properties. (*Id.* at ¶¶ 119–20.) HCS maintains that such selective enforcement was motivated by impermissible considerations of religion, demonstrated by Oliveri's comments indicating disparate treatment for Synagogue members as compared to members of the Catholic faith. (*Id.* at ¶ 121; D.E. 144 at 12–13.)

■ The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a mandate that all similarly situated persons be treated alike. *City of Cleburne, Tex. v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). The Eleventh Circuit has recognized that plaintiffs may bring an equal protection claim for

the unequal administration of a facially neutral statute, so long as intentional or purposeful discrimination is shown on the part of the state. *E & T Realty v. Strickland,* 830 F.2d 1107, 1112–13 (11th Cir. 1987) *citing Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944). To prevail on this traditional type of equal protection claim, basically a selective enforcement claim, Plaintiff must show (1) that it was treated differently from other similarly situated entities, and (2) that Defendant unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff. *Campbell v. Rainbow City, Ala.,* 434 F.3d 1306, 1314 (11th Cir.2006) *citing Strickland v. Alderman,* 74 F.3d 260, 264 (11th Cir.1996).

The Eleventh Circuit has held that in order for any two housing developments to be similarly situated, they must be *prima facie* identical in all relevant respects. *Id.* Thus, Plaintiff must show with some specificity that its house of worship was similarly situated to another house of worship that was treated disparately. *See id.* Additionally, projects seeking different types of variances in a zoning context are not considered similarly situated. *Id.*

In its motion, Defendant argues that Plaintiff has failed to state that any other religious organization or any other private business was granted a permanent Special Exception under the same or similar circumstances to those under which Plaintiff's application was denied. (D.E. 140 at 12.) Plaintiff responds by pointing out facts in its Second Amended Complaint alleging: (1) that the Commission has granted numerous permanent Special Exceptions to similarly situated houses of worship in the Hollywood Hills residential area; (2) that one house of worship operated for sixteen [11] years without a Special Exception,

---

11. The Court notes that there is a discrepancy

in the pleadings regarding the number of

only to be granted one immediately after inquiries by the Synagogue; and (3) that Rosa Lopez has operated a house of worship without being required to obtain a Special Exception, despite complaints about traffic, noise and garbage. (D.E. 144 at 12.) In its Reply, Defendant further argues that the fact that the words "similarly situated" never appear in Plaintiff's Second Amended Complaint is fatal to its equal protection claims.

The Court first notes that there is no requirement that Plaintiff's Complaint contain the words "similarly situated" in order to make out a claim for relief under the Equal Protection Clause. Instead, if the facts stated by Plaintiff, taken as true by the Court for purposes of this Motion, support the existence of other similarly situated entities that were treated differently, Plaintiff has stated a claim for relief. Here, Plaintiff alleges facts demonstrating numerous similarly situated entities.

First, Plaintiff has alleged that the City directed its police officers and code enforcement officers to constantly monitor the Synagogue and issue parking citations only to cars parked in front of the Synagogue's property. For purposes of the enforcement of traffic regulations, Plaintiff's status as a house of worship is irrelevant to its equal protection claims. Instead, it is enough that Plaintiff has alleged that cars parked in front of properties on the same street, with no readily apparent distinctions in the type of parking available, received disparate treatment from the cars parked in front of the Synagogue. This type of selective enforcement of the City's traffic codes is precisely the type of unequal administration of a facially

neutral law that is prohibited by the Equal Protection Clause.

Second, the Synagogue has alleged that the City applied its zoning regulations unequally, either by not requiring other similarly situated houses of worship to apply for Special Exceptions or by granting Special Exceptions to such houses. Specifically, Plaintiff alleges that numerous houses of worship are operated out of single family homes in the residential neighborhoods of the City and have been granted permanent Special Exceptions. (D.E. 125 at 15–16.) Plaintiff also alleges that one house of worship operated within a residential neighborhood for sixteen years without being required to apply for a Special Exception; only upon inquiries from the Synagogue did this church apply for, and immediately receive, a Special Exception. (*Id.* at ¶ 49.) Finally, Plaintiff alleges that Rosa Lopez operates a shrine to the Virgin Mary out of her home, hosting up to 4,000 people for monthly visits to see the apparition. (*Id.* at ¶ 50–51.) Plaintiff alleges that though Ms. Lopez's home is only three blocks from the Synagogue, and has received complaints regarding noise, traffic and garbage not materially distinct from those associated from the Synagogue, no Special Exception was ever required of her. (*Id.* at 16–18.) Any one of these allegations is sufficient to demonstrate that a similarly situated establishment was treated differently under a facially neutral law. Defendant's Motion to Dismiss must be denied as to these claims.

### E. Counts XIV and XV—Substantive Due Process Claims

In Counts XIV and XV, Plaintiff HCS alleges that the Commission's reversal of

---

years this house of worship operated without a Special Exception. In its Response to Defendant's Motion for Summary Judgment, Plaintiff states this number to be thirteen (13) years (D.E. 144 at 12), while the Second

Amended Complaint alleges the house operated for sixteen (16) years. (D.E. 125 at ¶ 49.) For purposes of this Motion to Dismiss, the Court will rely upon the number alleged in the Second Amended Complaint.

the decision of the DRB to grant a permanent Special Exception was arbitrary, capricious and unreasonable because it bore no substantial relation to issues of public health, safety, welfare, or morals. (D.E. 125 at ¶ 126.) Moreover, the Synagogue claims that it had a property interest in the DRB's grant of a Special Exception because the Synagogue expended money in good faith reliance on the DRB's conditions for the granting of a permanent Special Exception. (*Id.* at ¶ 128.) Thus, the Synagogue alleges that its substantive due process rights were violated by the Commission's reversal. (*Id.* at 34–35.)

In its Motion to Dismiss the Second Amended Complaint, Defendant first argues that these claims are redundant to Plaintiff's equal protection claims. Plaintiff responds by demonstrating the distinct basis of these claims as compared to that of its prior equal protection claims. In its Reply, Defendant argues that the claims should be dismissed because, *inter alia,* Plaintiff has not alleged facts regarding similarly situated houses of worship, what expenses were incurred by the Synagogue to meet zoning conditions and whether they were excessive, or what rights were acquired by the DRB's decision. However, Defendant does not provide any legal authority for these alleged insufficiencies.

■ In *Greenbriar, Ltd. v. City of Alabaster,* the Eleventh Circuit noted the long-established tenet that zoning regulations would not be declared unconstitutional as violative of substantive due process unless they were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." 881 F.2d 1570, 1577 (11th Cir.1989), *quoting Village of Euclid, Ohio v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). The *Greenbriar* Court went on to lay out the two-pronged test for violations of substantive due process: (1) it must be determined that there has been a deprivation of a federal constitutionally protected interest, and (2) that deprivation must be the result of an abuse of governmental power sufficient to raise an ordinary tort to the status of a constitutional violation. 881 F.2d at 1577 (citations and quotation marks omitted). The Court then elaborated that the second prong was met when the deprivation was undertaken for an improper motive and by means that were pretextual, arbitrary and capricious, and without any rational basis. *Id.* (citations and quotation marks omitted).

■ In *Coral Springs Street Systems, Inc. v. City of Sunrise,* the Eleventh Circuit held that vested rights could be created—thus engendering an enforceable entitlement to satisfy the first prong of the test—when a party had reasonably and detrimentally relied on existing law, creating the conditions of equitable estoppel. 371 F.3d 1320, 1334 (11th Cir.2004). Under Florida law, the doctrine of equitable estoppel may be raised against a local government when a property owner: (1) in good faith; (2) upon an act or omission of the government; (3) has made such a substantial change in position or incurs such substantial expenses that it would be highly inequitable and unjust to destroy the right the owner acquired. *Id.* (citations and quotation marks omitted). As further explained by the Court in *Coral Springs,*

the theory of equitable estoppel amounts to nothing more than an application of the rules of fair play. One party will not be permitted to invite another onto a welcome mat and then be permitted to snatch the mat away to the detriment of the party induced or permitted to stand thereon. A citizen is entitled to rely on the assurances or commitments of a zoning authority and if he does, the zoning authority is bound by its representa-

tions, whether they be in the form of words or deeds...

*Id.* at 1334–35, *quoting Town of Largo v. Imperial Homes Corp.*, 309 So.2d 571, 573 (Fla.Dist.Ct.App.1975).

The Court finds that while Plaintiff HCS has not provided a wealth of facts pertaining to the substantial expense incurred in reasonable reliance on the DRB's decision, Plaintiff has sufficiently alleged the contours of its substantive due process claim to satisfy the short and plain statement requirement of Rule 8. *Fed.R.Civ.P.* 8. HCS alleges that it was granted a permanent Special Exception by the DRB, subject to certain enumerated conditions that had to be met within 180 days for the permanent Special Exception to become final. The Synagogue further alleges that it expended time and sums of money in an attempt to meet these conditions and in reliance on the requirements set out by the DRB. However, with more than two-thirds of the allotted time remaining to meet such conditions, the Commission revoked the HCS's Special Exception because the Synagogue was allegedly "too controversial." This consideration was neither enumerated as a factor to be considered by the Commission in evaluating this decision, nor was it part of the conditions laid out by the DRB. Thus, the Synagogue has alleged facts demonstrating that the City of Hollywood extended the "welcome mat" by representing that HCS would be granted a Special Exception if

certain conditions were met, but then arbitrarily snatched the mat away for reasons unrelated to public health, safety, welfare or morals. Taken as true, these allegations state a claim that the Synagogue relied in good faith and to its detriment on representations by the City, such that subsequent denial of the property right acquired would be unjust and inequitable. Thus, Defendant City of Hollywood's Motion to Dismiss as to Plaintiff HCS's substantive due process claim is denied.[12]

### F. Count XVI—Promissory Estoppel Claim

■ In Count XVI, Plaintiff HCS alleges that the City knew, or should have known, that the Synagogue would rely to its detriment on the representations of the DRB that a permanent Special Exception would be granted if certain conditions were met. (D.E. 125 at ¶ 133.) The Synagogue claims that it thereby changed its position in reliance and expended sums of money to meet these requirements, and thus the City should be estopped from denying the Synagogue a permanent Special Exception. (*Id.* at ¶¶ 134–35.)

Defendant argues that this claim should be dismissed because Plaintiff has failed to specify what sums of money it expended, what requirements it had to meet, or what it did to meet those requirements. Defendant maintains that HCS must demonstrate "substantial" expenditures with

---

12. The Court notes that it previously dismissed Plaintiff HCS's substantive due process claim against Defendant Sal Oliveri in its Order of March 18, 2005. (D.E. 58 at 32–34.) While there, the Court found that no fundamental property right existed in the permanent Special Exception, this conclusion applies only as to the individual Defendant, Sal Oliveri. The Synagogue has repeatedly denied that it is seeking liability against Oliveri for his appeals or his votes during the City's consideration of HCS's application for a Spe-

cial Exception. Thus, Plaintiff has alleged no facts demonstrating that Oliveri denied the Synagogue of a fundamental property right. Nor can Plaintiff demonstrate that Oliveri's actions or representations induced the Synagogue to detrimentally rely in the first place. However, Plaintiff has stated a cause of action against Defendant City of Hollywood based upon its representations and subsequent revocation of the Special Exception. The Court hereby amends its previous Order to clarify any apparent inconsistencies.

clear and convincing evidence to support a cause of action. Plaintiff responds that it has specified the conditions and requirements imposed by the DRB for the grant of a permanent Special Exception. HCS maintains that the substantiality of its expenses is a question of fact not properly raised in a Motion to Dismiss.

Promissory estoppel is defined as follows: "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *W.R. Grace and Co. v. Geodata Services, Inc.*, 547 So.2d 919, 924 (Fla.1989) *quoting* Restatement (Second) of Contracts § 90 (1979); *see also Roberts v. Rayonier, Inc.*, 135 Fed.Appx. 351, 362 (11th Cir.2005). Nothing in this definition stipulates that the action or forbearance taken in reliance on the promise of the promisor be substantial in character, nor does the authority cited by Defendant provide any support for this position. Furthermore, should the substantiality of the reliance in question become relevant, it would be a question of fact not properly before the Court in the instant Motion to Dismiss. Additionally, Plaintiff need not provide clear and convincing evidence to survive a Motion to Dismiss, but need only allege a short and plain statement of its claim. *Fed.R.Civ.P.* 8. Plaintiff has satisfied this requirement, and thus Defendant's Motion to Dismiss as to this Count is denied.

### G. Count XVII—Facial Equal Protection Challenge to Article V of the City of Hollywood Code of Ordinances

■ In Count XVII, Plaintiff HCS alleges that Sections 5.3, 5.7 and 5.8 of the City of Hollywood's Zoning and Land Development Regulations (ZLDR) fail to provide any objective criteria by which to measure zoning decisions made by the Commission. (D.E. 125 at ¶ 140.) Thus, claims Plaintiff, these provisions grant the Commission unbridled and unreviewable discretion in its zoning decisions and render Article V void for vagueness. (*Id.* at ¶ 141.)

Defendant argues that this claim should be dismissed because Article V provides for an appeal of the City Commission's decision to the circuit court, a process in which Plaintiff participated regarding the property in question. Thus, Defendant maintains that Plaintiff's claim that there's no accountability or review process for those dissatisfied with the City Commission or DRB decision is without merit.

Plaintiff responds that its claim centers on the lack of objective guidelines or determinable criteria within the decisionmaking process and lack of administrative review of the Commission's decision, not on the appeals process for DRB decisions. Plaintiff argues that because the DRB makes Special Exception determinations based on factors other than those set forth in the Code, and because the Commission applies those same discretionary criteria when reviewing DRB decisions, Article V leads to arbitrary and capricious zoning decisions by both.

The Supreme Court has held that,
an ordinance which ... makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *see also FW/PBS, Inc. v. City of*

*Dallas,* 493 U.S. 215, 226, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Thus, a law regulating the exercise of First Amendment freedoms must contain narrow, objective, and definite standards to guide the licensing authority. *Shuttlesworth,* 394 U.S. at 150–51, 89 S.Ct. 935. While some measure of discretion is acceptable, standards must be precise and objective, and any amount of discretion beyond the merely ministerial is suspect. *Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1362 (11th Cir.1999).

Consequently, in *Lady J. Lingerie,* the Eleventh Circuit held that a Jacksonville land use ordinance specifying procedures for granting zoning exceptions was overly broad and unconstitutional. 176 F.3d at 1362. The provision contained numerous "run-of-the-mill" zoning considerations such as compatibility with contiguous uses, environmental impact, and effect of pedestrian traffic. *Id.* The Court found that none of the nine criteria was precise or objective, and all of them—individually and collectively—empowered the zoning board to covertly discriminate. *Id.*

Though the Eleventh Circuit's decision in *Lady J. Lingerie* dealt with the City of Jacksonville's regulation of adult entertainment establishments, it can readily be applied to the instant case, where the First Amendment Free Exercise Clause is implicated by the City of Hollywood's denial of a Special Exception for Plaintiff's house of worship. The criteria alleged to be applied by the DRB, and the Commission in reviewing the decision of the DRB, are equally vague and imprecise, using terms such as "compatible with the existing natural environment," "adequate provision for safe traffic movement," "adequate setbacks," and "land area is sufficient, appropriate and adequate for the use as proposed." (D.E. 125 at ¶ 139.) These terms are precisely the type of criteria the Elev-

enth Circuit in *Lady J. Lingerie* found overbroad and lacking objectivity. *See* 176 F.3d at 1362. Moreover, the alleged procedures in the instant case are even more constitutionally invidious, as they allow officials further discretion to deny a Special Exception even if all four enumerated criteria are met. (*See* D.E. 125 at ¶ 139 (Section 5.3 provides that, "the Board *may* grant the petition if the Board makes all of the following findings...") (emphasis in Complaint).) This is illustrated by the Synagogue's assertion that the Commission denied HCS a permanent Special Exception, without giving the Synagogue an opportunity to comply with its criteria or conditions, because the application was too "controversial." (D.E. 144 at 17–18.) As HCS has alleged that Article V provides officials far more than merely ministerial discretion, it has thus stated a claim for relief pursuant to the Supreme Court's vagueness jurisprudence.

## H. Count XIX—Preliminary Injunctive Relief

In Count XIX, Plaintiff HCS requests that the Court enter an appropriate injunction in the event that the court in the City's state court action against the Synagogue to prevent the use of the residence as a house of worship permits the action to move forward. (D.E. 125 at 39.) Therein, Plaintiff alleges that the Synagogue has a substantial likelihood of success on the merits, irreparable injury will result if the injunction is not issued, and the injury to the Synagogue outweighs whatever damages the proposed injunction may cause the City. (*Id.*)

Defendant argues that Plaintiff has failed to provide facts or legal authority supporting a preliminary injunction, and has further failed to follow the appropriate procedure by making a motion for such an injunction. Defendant also contends that

there is no exception to the Federal Anti–Injunction Statute that empowers the Court to grant such an injunction.

Plaintiff responds that it has alleged that this claim falls under the § 1983 exception to the Federal Anti–Injunction Statute. However, Plaintiff concedes that the City has not actively pursued declaratory or injunctive relief in its state court action, and the Synagogue has thus not been required to pursue this claim for a preliminary injunction. The Synagogue maintains that it will file an appropriate motion should the need arise.

The Court notes that Plaintiff has alleged a proper exception to the Federal Anti–Injunction Statute for relief from state court proceedings in a § 1983 action. *Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). However, the Court finds that the Synagogue's claim for a preliminary injunction is not ripe, as the City has not pursued declaratory or injunctive relief in state court. As the Synagogue therefore faces no immediate and irreparable harm, this claim shall be dismissed without prejudice. Should the need arise, the Synagogue may refile its claim for a preliminary injunction as a separate motion.

Accordingly, it is

**ORDERED AND ADJUDGED** that

1. Defendant City of Hollywood's Motion to Dismiss and/or Strike Second Amended Complaint (D.E. 140), filed January 5, 2006, is **GRANTED IN PART AND DENIED IN PART**, as follows:

 a. Counts I and II are **dismissed with prejudice in part** as to claims relating to an alleged *City policy of regularly granting Special Exceptions*. Defendant's Motion on Counts I and II as to claims of a City policy of harassment and as to

the single act of the Commission reversing the DRB's grant of a Special Exception is **denied.**

 b. Counts IV, V, X, and XI are **dismissed with prejudice.**

 c. Count XIX is **dismissed without prejudice.**

 d. Defendant's Motion as to all other Counts is **denied,** consistent with this Order.

2. Defendant City of Hollywood's Motion to Dismiss Plaintiff United States' Complaint (D.E. 225), filed May 28, 2005, is **DENIED.**